## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

TRI-STATE FLOORS, INC.,      )
                    )
       Plaintiff,      )
                    )
      vs.             )      Case No. 19-CV-707-JFH-JFJ
                    )
OLD RULE SERVICES, LLC, an      )
Oklahoma limited liability company;      )
CHAD BUNNELL, individually; and      )
JAMES R. BUNNELL, individually,      )
                    )
       Defendants.      )

## OPINION AND ORDER

Before the Court is Defendant Chad Bunnell's Motion for Summary Judgment (ECF No. 75), Defendant Old Rule Services, LLC's Motion for Summary Judgment (ECF No. 76), and Defendant James R. Bunnell's Motion for Summary Judgment (ECF No. 77). The parties consented to disposition of all three motions by a magistrate judge. ECF Nos. 96, 97.[1] The Court consolidates decision on all three motions into this Opinion and Order.

This case involves a father and son allegedly misappropriating trade secrets and committing other business-related torts against their former employer, for the benefit of the son's competing business. After consideration of the summary judgment record, the Court finds genuine issues of material fact on nearly all claims. The case will proceed to trial on all claims against all

---

[1] When the parties consented to magistrate judge disposition of the pending motions for summary judgment, they also consented to magistrate judge disposition of a pending motion to dismiss filed by Defendant James Bunnell. By separate order entered this date, the Court dismissed Tri-State's claim against James Bunnell for violation of the federal Computer Fraud and Abuse Act but denied the motion as to all other claims. ECF No. 102. The Court enters separate orders to delineate what, if any, claims are dismissed based on the pleadings versus the evidence.

Defendants, except the federal computer fraud act claim and the tortious interference with contract claim.

## I.      Facts in Summary Judgment Record[2]

Plaintiff Tri-State Floors, Inc. ("Tri-State" or "TSF") alleges violations of the federal Defend Trade Secrets Act of 2016 ("DTSA"), the federal Computer Fraud and Abuse Act ("CFAA"), the Oklahoma Uniform Trade Secrets Act ("OUTSA"), and several Oklahoma common law torts. Am. Compl. (ECF No. 31). The Amended Complaint names as defendants James R. Bunnell ("Jim"), Chad Bunnell ("Chad"), Old Rule Services, LLC ("Old Rule"), Rowdy Merritt ("Merritt"), and Legends Hardwoods LLC ("Legends"). Merritt and Legends have since been dismissed from this case. *See* ECF No. 78. Jim, Chad, and Old Rule are collectively referred to as "Defendants."

### A.      Background on Tri-State

Tri-State is an Oklahoma corporation with its principal place of business in Rogers County, Oklahoma. ECF No. 77 at 1 (James Bunnell Undisputed Fact 1). At all relevant times, Tri-State was a small company, with two owners, two managerial employees (Jim and Chad), an assistant to the President, and an internal accountant. ECF No. 85-1 (Affidavit of Alexander Verseman) ("Alex Aff.") at ¶¶ 3, 11. Jim founded Tri-State in 1986 with a business partner, and he owned

---

[2] Many facts in this section are taken from Tri-State's "Additional Undisputed Facts" in their response briefs. *See* ECF Nos. 85, 87, 89. In their reply briefs, Defendants do not dispute the majority of these facts with citations to their own evidence, as required by Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56.1(c)-(e). Instead, Defendants generally argue the additional facts either are not material to summary judgment or unsupported with any admissible evidence. *See* ECF Nos. 91, 92, 93. The Court finds many of Tri-State's additional undisputed facts highly material to the issues presented and has relied on them in deciding the pending motions. As to admissibility of Tri-State's evidence, Defendants did not make any specific evidentiary arguments, and it is not clear what evidence Defendants request the Court to exclude from its consideration. The Court has not excluded any of Tri-State's summary judgment evidence in deciding the pending motions.

and operated Tri-State until 2008, when he sold the business but stayed on as Tri-State's President. ECF No. 77 at 2 (James Bunnell Undisputed Facts 3-5). As President, Jim was responsible for overseeing sales and operations, including preparing bids and estimates or quotes for projects. Alex Aff. at ¶ 3.

Chad, Jim's son, "grew up" with the business and had worked at Tri-State full-time since 2006. ECF No. 75 at 3 (Chad Bunnell Undisputed Fact 2); ECF No. 75-1 (Affidavit of Chad Bunnell) ("Chad Aff.") at ¶ 4. Chad was Tri-State's full-time Operations Manager at all relevant times. Alex Aff. at ¶ 4. Chad was responsible for sales and overseeing projects after sale, including safety, performance, and quality of work. *Id.*

At all relevant times, Tri-State has been fully owned by Kent Verseman and Alexander Verseman ("Alex") (together, "the Versemans"), and they are both Vice-Presidents of Tri-State. Alex Aff. at ¶¶ 5-6. The Versemans both worked out of St. Louis, Missouri, *id.* at ¶ 6, while Jim and Chad ran daily operations in Oklahoma.

Tri-State is in the business of selling and installing high-quality flooring, including specialty and sports flooring. Am. Compl. ¶ 10. Tri-State also provides related services such as annual recoating. *Id.* Tri-State purchases supplies from interstate suppliers and sells those products and services to customers located in multiple states, including Oklahoma and Arkansas. *Id.* Beginning in 2017, Tri-State decided to use independent contractors, rather than employees, as a source of labor on Tri-State jobs. ECF No. 75 at 4 (Chad Bunnell Undisputed Fact 6).

**B.    Tri-State's Evidence Regarding Trade Secrets**

Through affidavits and deposition testimony, Tri-State offered the following evidence of its trade secrets. Tri-State has developed its "own unique means and methods for analyzing and costing out projects for bids and estimates." Alex Aff. at ¶ 7. Tri-State developed "detailed

spreadsheets that itemize projected materials, labor, supervision, equipment, shipping, overhead, profit, bond cost, insurance costs, taxes, and related items for any project." *Id.* Tri-State also developed "formulas within these spreadsheets that assisted TSF in developing project bids and estimates that gave it a competitive advantage." *Id.* Tri-State "frequently updated these spreadsheets and formulas through internal meetings and discussions about any changes in its market and the business." *Id.* Tri-State also has "lists and folders of prospective, current, and past customers." *Id.* These folders "contain past bids and estimates for projects, pricing structures, job costing spreadsheets, customer accounts, customer account histories, customer contacts, customer communications, details of customers' products, profit margins, and recoating/maintenance schedules." *Id.* Tri-State claims these trade secrets and confidential information have "substantial independent economic value," because they allow Tri-State to competitively bid and estimate projects while maximizing the profitability of each project, and because Tri-State has spent significant time and effort in developing them. *Id.* at ¶ 8; ECF Nos. 77-1 to 77-3 (Deposition of Alexander Kent Verseman) ("Alex Dep.") at 93:12-16 (explaining that Tri-State's pricing structures are confidential and provide a competitive advantage). Tri-State further claims its customer information is important to securing follow-up and repeat business with established customers, such as knowledge about performing routine maintenance, and knowledge of how to repair a floor installed by Tri-State when damaged, through familiarity with the original installation and access to "like and kind" materials. Alex Aff. at ¶ 9.

According to Tri-State, Jim and Chad were privy to all of Tri-State's confidential information and trade secrets. Alex Aff. at ¶ 10. Tri-State claims that its trade secrets and confidential information are not known to the public, and Tri-State protected the confidentiality of such information by limiting its access to Jim, Chad, the Versemans, Jim's assistant, and Tri-

State's internal accountant.  *Id.* at ¶ 11.  The information was maintained on Tri-State's password-protected server, with a VPN set up, with access limited to Jim, Chad, Alex, Jim's assistant, and Tri-State's internal accountant.  *Id.*  Areas were user-restricted within this server.  *Id.*

At routine quarterly meetings among Jim, Chad, and the Versemans, Jim and Chad were "frequently reminded of the importance of maintaining the confidentiality of Tri-State's trade secrets and confidential information."  *Id.* at ¶ 12.  Tri-State claims Jim and Chad "acknowledged to TSF's owners that they understood the importance of maintaining TSF's trade secrets and confidential information and that such information has significant economic value to TSF."  *Id.*  Tri-State claims it placed "a great deal of trust in Jim and Chad's understanding and acknowledgement of the importance of maintaining the confidentiality of TSF's trade secrets and confidential information."  *Id.*

Alex represents that he and Kent Verseman "do not share any of TSF's trade secrets or confidential information with anyone outside of the company."  *Id.* at ¶ 12.  Alex further represents that Jim had previously demonstrated to Tri-State's owners that he understood these confidentiality issues, when he promptly reported that his former business partner, Louis Brinlee, had been engaging in inappropriate competition after the sale of Tri-State.  *Id.* at ¶ 13.

While Tri-State's customers include many public-school systems, it also did work for private schools and universities, private gym and recreation facilities, and churches.  Alex Aff. at ¶ 16.  Although some of its public-school projects are subject to a bid process, some are not, including projects to repair water damage or other insurable events.  *Id.*  Tri-State claims that even its publicly available bid proposals and contracts with public schools do not include Tri-State's trade secrets or confidential information.  *Id.*  According to Tri-State, public school project bids typically include only a general description of the scope of work and the total price.  *Id.*; Alex Dep.

at 58:23-59:8 (explaining that "material, actual costs, margin, [and] labor costs" are not public knowledge, even when working with a public school as a customer).

As pointed out by Defendants, Tri-State has not produced the actual customer lists or folders, or its costing spreadsheets or formulas. *See* ECF No. 92 at 2 (Chad Bunnell Response to Tri-State's Statement of Additional Undisputed Material Facts 5). Further, Tri-State had nothing in writing, such as confidentiality agreements, non-disclosure agreements, or non-compete agreements that would preclude Tri-State's employees from sharing Tri-State's alleged confidential or trade secret information. ECF No. 77 at 4 (Jim Bunnell Undisputed Material Fact 21-22; Alex Dep. at 15:23-16:15, 26:16-25; ECF No. 75 at 7 (Chad Bunnell Undisputed Material Fact 25); Chad Aff. at ¶ 6. Tri-State also did not provide Jim or Chad any formal training regarding protection of Tri-State's trade secrets or confidential information. Alex Dep. at 27:1-5.

### C.    Chad's Formation of Old Rule/Confrontations About Old Rule

According to Tri-State, Chad formed Old Rule in October 2014, but he did not inform Tri-State's owners about Old Rule. Alex Aff. at ¶ 18. In August 2016, Tri-State learned of Old Rule's existence and Chad's ownership of Old Rule, when Old Rule submitted an invoice to Tri-State for certain design work for a Tri-State customer's gymnasium. *Id.* at ¶ 19. Tri-State claims the Versemans inquired of Jim and Chad about Old Rule, and Jim and Chad represented that Old Rule was owned by Chad as a side business, and it was not in competition with Tri-State. *Id.* at ¶ 20. The Versemans specifically inquired whether Old Rule was doing recoating or flooring work, and the Versemans emphasized that Old Rule could not compete with Tri-State in any way. *Id.* Jim and Chad assured the Versemans that Old Rule was not competing with Tri-State. *Id.*

In or around September 2017, Old Rule submitted another check request to Tri-State for performing design work, and Alex again inquired of Jim and Chad about Old Rule's activities.

Alex Aff. at ¶ 21.  Alex again informed Jim and Chad that Old Rule should not be doing such work and should not be competing with Tri-State in any way, and that any future Old Rule check request would be rejected.  *Id.*  Tri-State claims Jim and Chad both represented that Old Rule was not performing any flooring work and was not competing with Tri-State or doing similar work to Tri-State's business.  *Id.*  At various quarterly meeting with Jim and Chad between September 2017 and 2019, Tri-State claims the Versemans periodically inquired whether Old Rule was competing with Tri-State or performing services similar to Tri-State's, and both Jim and Chad represented that Old Rule was only a side business for Chad to perform home remodeling work and was not competing with Tri-State in any way.  *Id.* at ¶ 22.

### D.      Defendants' Alleged Wrongful Actions Against Tri-State

Tri-State claims Old Rule began competing with Tri-State as early as 2014.  Alex Aff. at ¶ 30.  For example, Alex represents that in December 2014, Old Rule performed an $11,160 sanding and recoating job for First Baptist Church of Ada, Oklahoma, and that Tri-State had performed this work for this customer in previous years.  *Id.*  Tri-State has provided a chart of numerous flooring projects it has learned Old Rule performed between 2014 and 2020, valued at a total of $328,466.98, in support of Alex's affidavit.  *Id.* at ¶¶ 31, 33, Exh. A-11 (chart).  Alex represents that, based on the information Tri-State has discovered, all of these Old Rule projects were for specialty sports flooring of the type Tri-State provides, and nearly all of these customers were Tri-State customers.  *Id.* at ¶ 33, Exh. A-11, Exh. A-12 (Old Rule invoices).  Alex also represents that Old Rule listed Chad's Tri-State cell phone number as Old Rule's telephone number on Old Rule's invoices and estimates, enabling Chad to intercept calls from potential Tri-State customers on behalf of Old Rule.  *Id.* at ¶ 34.

In May 2019, Tri-State's owner noticed that Tri-State had placed unusually large orders with its material supplier, Advantage Coating.  *Id.* at ¶ 23.  Using Tri-State's customer account and preferred pricing, Jim and/or Chad had placed an order for two pallets of recoating material and then had placed a second similar order for two more pallets a few days later.  *Id.*  When Jim and Chad were asked why Tri-State had been invoiced for such a large order, Jim and Chad denied that such an order had been placed or received and blamed it on an error by Advantage Coating. *Id.*  However, texts uncovered in this lawsuit indicate that, on May 21, 2019, Jim texted Chad notifying him that four pallets from Advantage had arrived at Tri-State.  *Id.* at ¶ 23, Exh. A-1 at TRI-STATE 000044.  Later that day, Jim signed the delivery tickets for both shipments of the four pallets, and Tri-State claims Jim used Tri-State equipment to unload the shipment at Tri-State's warehouse.  Alex Aff. at ¶ 23, Exh. A-2 (delivery tickets).  According to Tri-State, the second order was paid for by Old Rule.  Alex Aff. at ¶ 23.  Alex also claims that Jim and Chad placed other orders on Tri-State's account with Advantage Coating that were shipped to Tri-State but paid for by Old Rule in 2019 on May 10, July 3, and August 2.  *Id.*  Alex further states that Jim and Chad used Tri-State's account and special pricing with Applicators Technology to order recoating materials around May 31, 2019, and had such materials delivered to Tri-State and paid for by Old Rule.  *Id.*

According to Tri-State, Jim also repeatedly diverted prospective Tri-State customers and business opportunities to Old Rule.  *Id.* at ¶ 24.  For example, on April 17, 2019, Bluejacket Public Schools emailed Jim about having Tri-State refinish its gym floors, and Jim forwarded the email to Chad.  *Id.* at ¶ 24, Exh. A-3.  Thereafter, Old Rule submitted an estimate to Bluejacket, but Tri-State did not.  *Id.* at ¶ 24, Exh. A-4.  In another example, on July 18, 2019, Stratford Public Schools emailed Jim about having Tri-State recoat its gym floor as it had done in previous years, and Jim

8

forwarded the email to Chad on July 22, 2019.  *Id.* at ¶ 24, Exh. A-5.  On the same day, July 22, 2019, Old Rule submitted an estimate for the recoat work to Stratford.  *Id.* at ¶ 24, Exh. A-6.  Tri-State never submitted an estimate to Stratford, and Old Rule got the job.  *Id.* at ¶ 24, Exh. A-7. Jim also set up and attended a meeting with Vinita Public Schools in July 2019 to estimate repairing gym floor damage.  *Id.* at ¶ 29, Exh. 1 at TRI-STATE 000044.  Jim asked Chad to go with him to the meeting, and after the meeting, Old Rule submitted an estimate for the work and Tri-State did not.  *Id.* at ¶ 29, Exh. 1 at TRI-STATE 000049, Exh. A-10.[3]

Tri-State has presented some evidence that Jim was financially rewarded for diverting Tri-State customers to Old Rule.  Alex Aff. at ¶ 26, Exh. A-8 (Old Rule check made out to Jim for $2,000, dated June 16, 2017), Exh. A-1 at TRI-STATE 000009 (December 2017 text messages between Jim and Chad, in which Jim asked Chad "what do you think we have coming in on recoat in December for me and you My share," and Chad responded, "Roughly 2,000").  Jim is also listed as the salesperson on an Old Rule project in 2018.  *Id.* ¶ 27, Exh. A-9 (Old Rule invoice to Osage Public Schools dated September 14, 2018, listing "Jim Bunnell" as salesperson for floor coating job).  Tri-State also claims Jim performed work on Old Rule projects, including performing coating work for Old Rule during Tri-State work hours.  *Id.* at ¶ 28, Exh. A-1 at TRI-STATE 000046 & 000048 (text messages between Jim and Chad in June 2019, in which Jim informed Chad he was "done mopping" and had "coated" the floor, and Chad later informed Jim he had "[c]hecked Oneta Ridge gym floor," and it "[l]ooks really good" with "[a]bout four or five areas where there are runs," to which Jim responded "crap" and "fix them tomorrow?").

---

[3] This evidence, which the Court has labeled the "referral scheme," is explained in more detail in Part VII.

According to Tri-State, Jim and Chad also sold leftover Tri-State flooring inventory and did not give the proceeds to Tri-State. Alex Aff. at ¶ 35. For example, on April 12, 2019, Jim and Chad texted each other about leftover materials from the Salina project, and Jim stated, "I need to sell that to Richard Pate . . . ." *Id.* at ¶ 35, Exh. A-1 at TRI-STATE 000042. Later, Richard Pate asked Tri-State to install the flooring material it had sold him, but Tri-State learned that the leftover material from the Salina project was not in Tri-State's inventory and there was no record in Tri-State's files of the sale to Mr. Pate. *Id.* at ¶ 35. Alex further represents that Jim sold Tri-State materials to others, such as Greg Fuller of Forest Wood Floors, and Jim always requested to be paid in cash. *Id.* Tri-State claims to be missing over $35,000 in flooring materials from its inventory that Jim and Chad sold. *Id.* Alex also represents that Jim sold a Tri-State truck, and there is no record of the proceeds going to Tri-State. *Id.*

Beginning in 2017, Tri-State started using more subcontractors to perform the labor portion of Tri-State projects, including former Tri-State employee Rowdy Merritt and his company Legends. ECF No. 77 at 3 (Jim Bunnell Undisputed Material Fact 17); Alex Aff. at ¶ 36; ECF Nos. 77-6 to 77-7 (Deposition of Rowdy Merritt) ("Merritt Dep.") at 8:1-12; Alex Dep. at 12:15-13:4. According to Tri-State, Tri-State's subcontractors are provided the customer's name, the scope of the work to be performed by the subcontractor, and the price Tri-State will pay them for the work. Alex Aff. at ¶ 36; Merritt Dep. at 39:8-16, 45:17-24.

In June 2019, Tri-State subcontracted labor for a flooring project at Oneta Middle School in the Broken Arrow Public School District ("BAPSD") to Legends. Alex Aff. at ¶ 37. Without informing Tri-State, Legends then subcontracted its work on the project to Old Rule, and Old Rule performed the labor and was ultimately paid for the Tri-State job by Legends. *Id.*; Merritt Dep. at 93:11-94:23. BAPSD had been a longtime Tri-State customer, and Old Rule has since obtained

additional work for that district.  Alex Aff. at ¶ 37, Exh. A-12 at Invoice #1046, #1047, #1048, #1049 (2020 Old Rule invoices for BAPSD flooring projects).[4]  When it learned that Old Rule was competing directly with Tri-State and that Jim was aware of and assisting such activities, Tri-State terminated both Jim and Chad on August 15, 2019.  Am. Compl. ¶ 36.

As to their alleged wrongful conduct, Defendants present undisputed evidence that Tri-State did not have formal procedures or policies in place either to prohibit Chad or Old Rule from accepting subcontracting work from Tri-State, or to limit Jim's discretion in subcontracting Tri-State work to a subcontractor.  Alex Dep. at 32:25-33:6, 36:10-20; ECF No. 75 at 6 (Chad Bunnell Undisputed Material Fact 23).  Tri-State further admits there was nothing in writing that prevented Merritt or Legends from subcontracting flooring work to Old Rule.  Alex Dep. at 50:19-24; ECF No. 77 at 3 (Jim Bunnell Undisputed Material Fact 18); ECF No. 75 at 6 (Chad Bunnell Undisputed Material Fact 16).

In his own affidavit, Jim represents that he has never had any connection or affiliation with Old Rule, except for the fact that its owner is his son.  ECF No. 77-4 (Affidavit of James R. Bunnell) ("Jim Aff.") at ¶ 8.  Jim denies that he has ever profited or benefited from work done by Old Rule.  *Id.* at ¶ 10.  Jim further denies that he has ever stolen or sold Tri-State products to a third party for personal gain.  *Id.* at ¶¶ 6-7.  Jim represents that he has never referred any Tri-State work or project to Old Rule.  *Id.* at ¶ 9.  Jim further represents that, while working at Tri-State, he never engaged with any other business aside from Tri-State for his own benefit, and he never interfered with Tri-State's business practices.  *Id.* at ¶¶ 4-5.[5]

---

[4] This evidence, which the Court has labeled the "pass through scheme," is explained in more detail in Parts VII and VIII.

[5] Chad and Old Rule did not dispute or otherwise present evidence as to Chad and Old Rule's alleged wrongful conduct.

### E.     Claims Asserted in Lawsuit

Tri-State filed this lawsuit on December 23, 2019.  Tri-State currently asserts a total of thirteen causes of action against Jim, Chad, and Old Rule.  Specifically, Tri-State seeks relief against all Defendants for: (1) violation of the DTSA (Count 1); (2) violation of OUTSA (Count 2); (3) tortious interference with business relations (Count 3); (4) tortious interference with contract (Count 4); and injunctive relief (Count 13).  Tri-State additionally seeks relief against Jim and Chad for: (1) breach of fiduciary duty (Count 5 against Jim and Count 6 against Chad); (2) fraud/false representation/deceit (Count 7); (3) fraud/nondisclosure/concealment (Count 8); (4) civil conspiracy (Count 9); (5) violation of the CFAA (Count 10); (6) conversion (Count 11); and (7) unjust enrichment (Count 12).  Tri-State seeks various forms of injunctive relief, actual damages, and exemplary damages.

### F.     Motions for Summary Judgment

Jim filed a motion to dismiss the claim against him, and the Court denied the motion with respect to all counts except for the federal CFAA claim.  All Defendants now seek summary judgment on all remaining claims against them.  Defendants' motions for summary judgment contain overlapping arguments but are not identical.  Jim asserts his own arguments and evidence, while Chad and Old Rule assert their own arguments and evidence.[6]  Tri-State's evidence is identical across all three motions.  In explaining whether Jim, Chad, or Old Rule is entitled to summary judgment, the Court delineates each party's arguments and evidence.

---

[6] Old Rule adopted all arguments and evidence in Chad's briefing and did not raise independent arguments.  Old Rule also adopted the arguments and evidence in the Motion for Summary Judgment filed by terminated defendant Rowdy Merritt.  Merritt was dismissed from this case before briefing was completed on his motion, and the Court has not considered Merritt's motion in ruling on Old Rule's motion.

## II.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*  As the court makes this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

A party opposing a motion for summary judgment may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c); *see Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994) ("Even though all doubts must be resolved in [the non-movant's] favor, allegations alone will not defeat summary judgment.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted).  The inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  To survive summary judgment, the "nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  *Told v. Tig Premier Ins. Co.*, 149 Fed. App'x 722, 725 (10th Cir. 2005) (cleaned up).

### III.    Federal Misappropriation of Trade Secrets (Count 1)

Under the DTSA, an "owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  *See ATS Group, LLC v. Legacy Tank & Indus. Servs., LLC*, 407 F. Supp. 3d 1186, 1197 (W.D. Okla. 2019) (explaining that a plaintiff alleging violation of the DTSA "must allege that it lawfully owned information of independent economic value that it took reasonable measures to keep secret, and that the defendant under consideration either acquired, disclosed, or used, improperly") (citing 18 U.S.C. § 1839 – DTSA definitions); *Blue Star Land Servs., LLC v. Coleman*, No. CIV-17-931-R, 2017 WL 6210901, at *4 (W.D. Okla. Dec. 8, 2017) (discussing elements of DTSA claim).

Defendants argue the DTSA claim fails because (1) Tri-State owned no protectable trade secrets and failed to identify them with requisite particularity; and (2) Tri-State did not take reasonable measures to keep any such information secret.  Jim additionally argues Tri-State has no evidence that he personally misappropriated any trade secrets.

### A.    Protectable Trade Secrets

In general, a "trade secret" is certain information that (1) is subject to reasonable measures of secrecy taken by its owners, and (2) derives independent economic value from not being generally known or readily ascertainable through proper means.  *See* 18 U.S.C. § 1839(3).  The DTSA provides categories of information that may meet such criteria: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in

14

writing." 18 U.S.C. § 1839(3). "The question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder." *ATS Group, LLC*, 407 F. Supp. 3d at 1198 (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003)) (cleaned up).

To determine whether a DTSA plaintiff has adequately defined a trade secret for summary judgment purposes, "[f]ederal courts typically require identification of a trade secret with reasonable particularity or sufficient definiteness, so the defendant and the court know what issues are before them." *Quest Solution, Inc. v. Red LPR, LLC*, No. 2:19-cv-437-CW-DBP, 2021 WL 1688644, at *2 (D. Utah, Apr. 28, 2021) (collecting cases). Under this standard, "a plaintiff bears the burden to define the claimed trade secret sufficiently for discovery to be meaningful, for boundaries to be known, and for the fact-finder to understand what is to be decided." *Id. See InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (explaining that, to prove existence of a trade secrets under DTSA, plaintiff must "clearly refer to tangible trade secret material instead of referring to a system which *potentially* qualifies for trade secret protection.") (cleaned up).

The Court finds a genuine question of material fact as to whether Tri-State had protectable trade secrets during the relevant period of alleged misappropriation. Alex identified Tri-State's pricing structure and customer lists as alleged trade secrets in his affidavit. Alex Aff. at ¶7. With respect to its pricing structure, Alex stated:

> TSF and its owners developed its own unique means and method for analyzing and costing out projects for bids and estimates. In particular, TSF developed detailed spreadsheets that itemize projected materials, labor, supervision, equipment, shipping, overhead, profit, bond cost, insurance costs, taxes, and related items for any project. TSF also developed formulas within these spreadsheets that assisted TSF in developing project bids and estimates that gave it a competitive advantage. TSF frequently updated these spreadsheets and formulas through internal meetings and discussions about any changes in its market and the business.

*Id.* With respect to customers lists, Alex stated:

> TSF's trade secrets also include lists and folders of prospective, current and past customers. These customer folders contain past bids and estimates for projects, pricing structures, job costing spreadsheets, customer accounts, customer account histories, customer contacts, customer communications, details of customers' products, profit margins, and recoating/maintenance schedules.

*Id.* This evidence is sufficient to survive summary judgment. Most specifically, Tri-State provided sufficient evidence to present to a jury that it had trade secrets in the form of (1) its unique pricing structure memorialized in detailed spreadsheets; and (2) its customer lists for past, current, and prospective customers, containing detailed customer information.

Although Defendants argue this information was widely known in the flooring industry and readily ascertainable by competitors, "a trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Iofina, Inc. v. Khalev*, No. CIV-14-1328-M, 2016 WL 5794793, at *2 (W.D. Okla. Oct. 4, 2016) (cleaned up). Tri-State arguably spent considerable time and effort compiling both its pricing structure and its customer lists. Further, with regard to Tri-State's customer lists, the mere fact that someone could discover some of the protected information does not negate its trade secret value. *See Select Energy Servs. v. Mammoth Energy Servs., Inc.*, 2019 WL 1434586, at *5 (W.D. Okla. Mar. 29, 2019) (explaining "the fact that an enterprising individual could discover the identity of certain employees does not negate the trade secret value of an employee list, which, like a customer list, is likely to contain contact information and other information not readily available"). Based on the evidence provided by Tri-State, it may be inferred that access to such confidential information would provide a competitive advantage in the flooring business. *See Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d

946, 952 (10th Cir. 1978) (finding under Oklahoma law that confidential data regarding operating

and pricing policies can qualify as trade secrets, explaining that "[i]t is apparent that the ability to

predict a competitor's bid with reasonable accuracy would give a distinct advantage to the

possessor of that information"). Here, Tri-State has provided evidence that its public information

has real economic value only when combined with Tri-State's nonpublic information.

Defendants further argue that Tri-State has not produced any documents memorializing its

alleged trade secrets. However, trade secret identification is "not susceptible to a talismanic

procedure." *Quest Solution*, 2021 WL 1688644, at *2 (cleaned up). Tri-State need not produce

the actual contents of the trade secret in order to prove they have a trade secret, provided it

describes the claimed trade secret with "reasonable particularity or sufficient definiteness." *Id.*

*See InteliClear*, 978 F.3d at 659 (finding genuine issue of material fact as to whether plaintiff

identified its trade secrets with sufficient particularity, where plaintiff submitted declarations

describing specific features of the alleged trade secrets). Here, Alex's affidavit and deposition

describe Tri-State's trade secrets in sufficient detail to raise a question of fact.

### B.      Reasonable Measures of Secrecy

The DTSA requires that the owner of a trade secret must take "reasonable measures to keep

such information secret." 18 U.S.C. § 1839(3)(A). The issue of whether a plaintiff took

"reasonable" measures is generally one of fact for the jury, and only in extreme cases can be

decided as a matter of law. *ATS Group*, 407 F. Supp. 3d at 1199 (citing *Learning Curve Toys,

Inc.*, 342 F.3d at 724-25). "'Reasonable efforts to maintain secrecy need not be overly extravagant,

and absolute secrecy is not required.'" *Id.* (quoting *AvidAir Helicopter Supply, Inc. v. Rolls-Royce

Corp.*, 663 F.3d 966, 974 (8th Cir. 2011)). *See Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1113 (10th

Cir. 2009) (in evaluating secrecy measures under Colorado trade secrets act, noting that, "there

always are more security precautions that can be taken," and "[j]ust because there is something else that [the company] *could* have done does not mean that their efforts were unreasonable under the circumstances").

Tri-State provides evidence it took reasonable measures to protect the secrecy of its alleged trade secrets. First, Tri-State stored its trade secret information on an internal password-protected server with a VPN set up, and access limited to Jim, Jim's assistant, Chad, Alex, and Tri-State's internal accountant. Alex Aff. at ¶ 11. Access to areas of data also was user-restricted within the server. *Id.* Alex stated that Tri-State was a very small company, with only six people (Jim, Chad, Jim's assistant, the Versemans, and an internal accountant) who had access to its trade secret information during the relevant period of alleged wrongful conduct. *Id.* at ¶¶ 3-5, 10-11.

Second, Tri-State provides evidence that its owners regularly met with Jim and Chad, and they reminded Jim and Chad of the importance of maintaining secrecy of Tri-State's trade secrets. *Id.* at ¶ 12. Alex stated that Jim and Chad acknowledged to Tri-State's owners that they understood the importance of maintaining Tri-State's trade secrets and confidential information, and that such information had significant economic value to Tri-State. *Id.* With Jim and Chad's long history of working for Tri-State, extensive knowledge of the industry, and experience with competition and threats, Tri-State placed trust in Jim and Chad's understanding and acknowledgment of the importance of maintaining the confidentiality of Tri-State's trade secrets. *Id.* Alex additionally stated Jim had previously demonstrated to Tri-State's owners that he understood these confidentiality issues, because he promptly reported that his former business partner, Louis Brinlee, had been engaging in inappropriate competition after the sale of Tri-State. *Id.* at ¶ 13.

Considering Tri-State's small size, the small number of Tri-State owners and employees with access to trade secrets, the repeated reminders to maintain secrecy and acknowledgement

thereof, and the steps taken on Tri-State's servers, the evidence is sufficient to create a triable issue

on whether Tri-State took reasonable steps to maintain secrecy of its trade secrets. *See Treco Int'l

S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1287 (S.D. Fla. 2010) (reasonable steps to protect trade

secret information may include limiting dissemination of such information only to trusted

employees and others who needed to know, repeatedly instructing defendants to maintain the

confidentiality of such information, and having defendants sign non-disclosure agreement); *ATS

Group*, 407 F. Supp. 3d at 1199 (finding that written employee handbook with confidentiality

provision, as well as protection of corporate information with passwords and limited access to

employees based on role, were sufficient to allege "reasonable steps" to maintain secrecy). *Cf. RV

Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2020 WL 6701119, at *26-27 (D. Colo. Nov. 13,

2020) (finding secrecy measures unreasonable under DTSA, where plaintiff company failed to

provide any specific evidence regarding the "limited number of individuals" who had access to

investor lists alleged as trade secrets; there was no evidence that company had informed defendants

that investor lists were confidential trade secrets prior to removing their access to lists; company

provided no evidence of confidentiality agreement, handbook, or training regarding access to or

use of investor lists; and company contended they had only some "implicit understanding" with

defendants regarding acceptable use of the investor lists).

      Defendants argue that, even if Tri-State took the above measures to protect its secrets, they

are still entitled to summary judgment, because those measures were negated by other conduct.

Defendants cite three actions by Tri-State that negated any secrecy.  The Court rejects all three.

      First, Defendants contend that Tri-State did not protect its trade secrets, because it did not

require Jim or Chad to sign any confidentiality agreement and did not provide any formal training

or written policy of non-disclosure.  Tri-State admits it did not require its employees to sign any

confidentiality agreements and did not provide formal training or any written policy of non-disclosure.  ECF No. 77 at 4 (Jim Bunnell Undisputed Material Fact 21); Alex Dep. at 15:23-16:15, 27:1-5.  Nonetheless, the lack of written agreement policy does not necessarily negate the secrecy measures Tri-State took to keep its trade secrets from being disclosed outside the company.  Tri-State took other measures to protect its trade secrets, including regularly reminding Jim and Chad of the importance of protecting Tri-State's trade secrets and obtaining their oral acknowledgment.  Given Tri-State's small size and the long experience of its managerial staff, it may not have been unreasonable to forego additional measures, such as written policies or agreements.

Second, Defendants contend Tri-State negated its trade secrets by providing flooring services for public school districts, which require an open bid process.  Tri-State admits that many of its customers are public school systems, with some projects subject to an open bid process.  Alex Aff. at ¶ 16.  However, Alex stated that Tri-State also did work for private schools and universities, private gym and recreation facilities, and churches.  *Id.*  Alex further stated that some of Tri-State's public-school projects are not subject to a bid process, such as work to repair water damage, and former employee Rowdy Merritt testified that some schools simply hired a flooring company due to past relationships.  *Id.*; Alex Dep. at 27:21-28:1; Merritt Dep. at 33:11-34:5.  Alex also stated that Tri-State's public bids on public school projects do not contain Tri-State trade secrets, such as pricing formulas Tri-State used to create the bid.  Alex Aff. at ¶ 16.  Thus, even an open records request to a public school or public entity would not learn the confidential pricing information that goes into a flooring bid.

Tri-State further points out that even its public bid and customer information is not "readily ascertainable," because there are hundreds of public-school districts in Oklahoma, as well as many public universities, community colleges, technical schools, and other public entities with gyms.  It

would take extraordinary effort to repeatedly issue open records requests on such entities to discover whether Tri-State performed gym flooring work and at what price. Thus, such information is not "readily ascertainable" simply because some of that information may be discoverable through an open records request.

Third, Defendants argue Tri-State did not maintain secrecy of its trade secrets, because it subcontracted labor for some projects to outside contractors. Tri-State admits it used subcontractors to perform much of the labor for Tri-State projects beginning in 2017. Alex Aff. 12:24-13:4. Defendants argue that Tri-State's alleged trade secrets would have been disclosed to those subcontractors, if it was not already publicly available information. Chad additionally points to a draft subcontractor agreement that Alex had prepared, noting that it did not contain a confidentiality provision. *See* Alex Dep. at 104:21-105:18. However, Rowdy Merritt testified that, when he worked for Tri-State as an independent contractor, Tri-State simply informed him of the price it would pay for labor. Merritt Dep. at 39:8-16, 45:17-24. Tri-State argues such disclosed information does not include the detail of Tri-State's alleged trade secrets, such as internal analysis of the project, its pricing formula, material and labor costs for the project, overhead, taxes, profit margins, bond costs, insurance costs, and similar expenses. Thus, Tri-State's use of subcontractors to perform labor on Tri-State's projects also does not entitle Defendants to summary judgment. *Cf. Farmers Edge v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020) (finding plaintiff had not taken "reasonable steps to safeguard its trade secrets" when it "shared the relevant information with a third-party who had no obligation to keep it confidential").

### C.    Misappropriation

"Misappropriation" includes both (1) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," and (2)

"disclosure or use of a trade secret of another without express or implied consent by a person who"

acquired the trade secret under circumstances giving rise to a duty to maintain the secrecy of the

trade secret or limit the use of the trade secret.  18 U.S.C. § 1839(5).  "Improper means" is defined

to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain

secrecy, or espionage."  18 U.S.C. § 1839(6).

Jim argues there is "no evidence that Jim improperly obtained or improperly used any Tri-

State information to Tri-State's detriment."  ECF No. 77 at 10.[7]  However, Tri-State has provided

evidence of three instances in which Jim arguably used his knowledge of Tri-State's trade secret

information about its customer lists and pricing schedules to assist Chad in diverting Tri-State

customers to Old Rule.  First, on April 17, 2019, Bluejacket Public Schools emailed Jim about

having Tri-State refinish its gym floors, and Jim forwarded the email to Chad.  Alex Aff. at ¶ 24,

Exh. A-3 (email).  Thereafter, Old Rule submitted an estimate to Bluejacket, but Tri-State did not.

*Id.* at ¶ 24, Exh. A-4 (Old Rule estimate).  Second, on July 18, 2019, Stratford Public Schools

emailed Jim about having Tri-State recoat its gym floor as it had done in previous years, and Jim

again forwarded the email to Chad.  *Id.* at ¶ 24, Exh. A-5 (email).  Old Rule then submitted an

estimate for the work, and Old Rule got the job.  *Id.* at ¶ 24, Exh. A-6 (Old Rule estimate), Exh.

A-7 (Old Rule invoice).  Third, Jim set up a meeting with the Vinita Public Schools' superintendent

to estimate repairing some gym floor damage.  *Id.* at ¶ 29, Exh. A-1 at TRI-STATE 000044 &

TRI-STATE 000049 (text messages).  Alex represents that Jim and Chad both attended the meeting

in July 2019, and after the meeting, Old Rule submitted an estimate but Tri-State did not.  *Id.* at ¶

---

[7] Chad does not dispute that Tri-State sufficiently demonstrated misappropriation, for purposes of the DTSA and OUTSA claims against him.  *See* ECF No. 75 at 10-14.  Old Rule argues in its "Conclusion" that Tri-State has "failed to show Old Rule misappropriated any trade secret," but it does not expand on this argument.  ECF No. 76 at 2.

29, Exh. A-10 (Old Rule estimate).  This evidence, while not conclusive, permits the reasonable inference that Jim misappropriated Tri-State's trade secrets.

Jim represents in his affidavit that he has never referred any Tri-State work or project to Old Rule.  Jim Aff. at ¶ 9.  Jim further represents that, while working at Tri-State, he never engaged with any other business aside from Tri-State for his own benefit, and he never interfered with Tri-State's business practices.  *Id.* at ¶¶ 4-5.  However, Jim does not dispute Tri-State's evidence, as set forth above, which suggests that he assisted Chad in stealing Tri-State customers by misappropriating Tri-State's confidential customer information and pricing formulas.  Jim's affidavit does not entitle him to summary judgment, in light of the contrary evidence presented by Tri-State.

In his reply brief, Jim disputes that Bluejacket or Stratford were Tri-State "customers," as opposed to schools simply seeking a bid.  He further argues that it was standard practice for Jim to forward emails requesting bids to Chad, because Chad did the majority of the bidding on Tri-State projects.  However, Jim does not support these arguments with any citations to the record, and they were not presented as statements of material fact as required by this Court's Local Rule 56.1.  Therefore, the Court does not consider these unsupported arguments on summary judgment.  *See* Fed. R. Civ. P. 56(c), (e); LCvR 56.1(e).  Even if they were supported, they would simply demonstrate disputes as to the material facts.

Jim further disputes whether any trade secret material could be disclosed as a result of a public school's seeking a flooring bid, because any information about the cost of the projects would be readily ascertainable by the public.  However, as explained above, Tri-State has provided

sufficient evidence showing that even its public-school bids contain proprietary pricing information that is not known to the customer or the general public.[8]

The Court finds sufficient circumstantial evidence to infer misappropriation by Jim, which is sufficient for Tri-State to avoid summary judgment. *See Bradbury Co., Inc. v. Teissier-duCros*, 413 F. Supp. 2d 1209, 1225 (D. Kan. 2006) (finding circumstantial evidence of misappropriation sufficient to avoid summary judgment under Kansas trade secrets act, explaining that "direct evidence of trade secret misappropriation is rarely available") (citation omitted). Jim has failed to set forth any evidence, other than his bare denials (Jim Aff. at ¶¶ 8-9), to overcome this inference for summary judgment purposes.

Defendants' motions for summary judgment on this claim are denied.[9]

## IV.    Federal Computer Fraud (Count 10)

As explained in the Opinion and Order on Jim's Motion to Dismiss, Tri-State's claim for violation of the federal CFAA fails as a matter of law as to Jim.  ECF No. 102 at 16-18.  In its response to Chad's motion, Tri-State concedes this claim.  *See* ECF No. 87 at 24.

Chad's motion for summary judgment on this claim is granted.

## V.    Oklahoma Misappropriation of Trade Secrets (Count 2)

Defendants argue Tri-State's claim pursuant to OUTSA fails for essentially the same reasons argued above in Part III.  OUTSA "establishes a greater burden [than federal law] to plead a trade secrets misappropriation claim."  *Blue Star*, 2017 WL 6210901, at *7.  In addition to

---

[8] Jim also summarily argues that Tri-State has not demonstrated any "detriment," but this is not an element of a DTSA civil claim.  *See* 18 U.S.C. §§ 1836(b)(1), 1839(5).

[9] Chad and Old Rule argue that, if the federal claims against them are dismissed, then the Court should relinquish its supplemental jurisdiction over the remaining state law tort claims pursuant to 28 U.S.C. § 1367(c)(3).  Because the Court finds that Tri-State's federal DTSA claim remains, the Court rejects this argument.

showing the elements of a federal DTSA claim, the plaintiff must additionally show "use" of the trade secret to the plaintiff's "detriment" in order to state an OUTSA claim.  *Id.*[10]

As explained above, Tri-State has demonstrated issues of material fact regarding the elements of its DTSA claim, and therefore, the identical elements of the OUTSA claim.  In addition, Tri-State has provided sufficient evidence to reach a jury as to whether Jim used Tri-State's trade secrets to Tri-State's detriment, the additional element required under OUTSA.  As examples, Tri-State provided email correspondence showing that both Bluejacket Public Schools and Stratford Public Schools had contacted Jim about hiring Tri-State to re-finish their gym floors in 2019.  *See* Alex Aff. at ¶ 24, Exh. A-3, Exh. A-5.  Jim forwarded the requests to Chad, and then Old Rule submitted estimates to Bluejacket and Stratford for the re-finishing work but Tri-State did not.  *Id.* at ¶ 24, Exh. A-3, Exh. A-4, Exh. A-5, Exh. A-6.  Old Rule obtained the Stratford re-finishing job, and Tri-State did not.  *Id.* at ¶ 24, Exh. A-7.  This evidence is sufficient to raise an issue of material fact regarding whether Jim personally used Tri-State's trade secrets, in the form of confidential customer and pricing information, to Tri-State's detriment by assisting Old Rule in retaining the work instead of Tri-State.

Defendants' motions for summary judgment on this claim are denied.

---

[10] For purposes of OUTSA, "Oklahoma has adopted six factors from the Restatement of Torts to help determine whether information is a trade secret: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1189 (10th Cir. 2009) (cleaned up).  None of the Defendants argue that this test is more stringent than the DTSA test for "trade secrets," and the Court will not analyze the factors separately.

## VI.     Displacement of Remaining State-Law Claims by OUTSA

Defendants argue that Tri-State's state-law claims are displaced by OUTSA.[11]

### A.       General Principles

OUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret" but does not affect "other civil remedies that are not based upon misappropriation of a trade secret."  Okla. Stat. tit. 78 § 92(A) & (B)(2).  *See Amer. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 827 (Okla. 2016) (explaining that "Section 92(B)(2) leaves in place torts not based on misappropriation of a trade secret").

The Tenth Circuit has not issued a comprehensive decision on OUTSA displacement or an analogous UTSA displacement provision. The Tenth Circuit has, however, positively cited and followed *Powell Products, Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996), which addressed Colorado's identical UTSA displacement provision.  *See Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1116 (10th Cir. 2009) (citing and following *Powell Products* in holding that Colorado civil conspiracy claim was not displaced).  In accordance with the Tenth Circuit's direction, and because its reasoning is persuasive, the Court adopts and follows *Powell Products* for purposes of this analysis.[12]

---

[11] Jim contends that all of Tri-State's remaining state-law claims against him, except injunctive relief, are displaced under Section 92(A) of OUTSA.  Chad and Old Rule contend that all remaining state-law claims against them are displaced, except the two fraud claims and the conversion claim against Chad.  The Court addresses all claims out of an abundance of caution.

[12] The Court declines to follow two Oklahoma district court cases cited by Jim, because they are inconsistent with *Powell Products* and *Hertz*.  *See CTI Servs. LLC v. Haremza*, 797 F. Supp. 2d 1257, 1261-62 (N.D. Okla. 2011); *Gaedeke Holdings VII, Ltd. v. Mills*, No. CIV-11-649-M, 2014 WL 347629, at *3 (W.D. Okla. Jan. 30, 2014).  Neither decision cites *Hertz*, and the decisions appear to be contrary to the reasoning of *Powell Products*.

The court in *Powell Products* "disagree[d] with those courts that have applied a blanket preemption to all claims that arise from a set of circumstances that happen to involve information that the plaintiff claims is in the nature of a trade secret." *Id.*  The court concluded it was "neither necessary nor prudent to preclude all common law claims that are connected with the misappropriation of what a plaintiff claims are trade secrets." *Id.*

Instead, displacement is appropriate only "where 'other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation.'" *Id.* (quoting Roger M. Milgrim, *Milgrim on Trade Secrets*, § 1.01[4], at 1-68.14 (1996)).  For example, a plaintiff may claim that the defendants interfered with its business relationships.  *Id.*  Although the plaintiff may contend that it had trade secrets that defendants misappropriated in connection with that interference, defendants "could be liable for interference with business relations even if they did not misappropriate any trade secrets from plaintiff." *Id.*  By contrast, a plaintiff could raise a conversion claim alleging that defendants stole plaintiff's trade secrets. *Id.* at 1475.  Such a claim would be displaced, because the claim's success depends exclusively on whether plaintiff possesses a trade secret that was misappropriated. *Id.*

Under this reasoning, a claim is also not displaced by OUTSA if it involves a trade secret misappropriation issue but also includes additional elements not necessary for the OUTSA claim. *Id.*  For example, if a plaintiff alleges that defendants conspired to misappropriate trade secrets, such a claim requires an additional element of an agreement.  *Id.*  Because an agreement is not an element of a misappropriation claim under the UTSA, the conspiracy claim is not displaced.  *Id.*

### B.     Analysis

Applying *Hertz* and *Powell Products*, the Court rejects Defendants' arguments with respect to all of the state-law claims.

### 1.    Civil Conspiracy

Tri-State's civil conspiracy claim is not displaced by OUTSA, even to the extent it covers misappropriation of trade secrets.  As *Powell Products* explained and *Hertz* endorsed, this claim requires the additional element of an agreement, which means it should not be displaced by OUTSA.  *See Hertz*, 576 F.3d at 1116 (finding no UTSA displacement of civil conspiracy claim); *Powell Prods.*, 948 F. Supp. at 1474 (same).

### 2.    Tortious Interference with Contract, Conversion

As explained in Parts VIII and XII, the facts supporting these claims do not involve misappropriation of trade secrets.  The tortious interference with contract involves a "pass through" scheme, whereby Defendants allegedly secretly performed work on a Tri-State job and received payment from a subcontractor.  The conversion claim involves theft of flooring materials and a truck.  These claims do not involve, and certainly do not exclusively involve, the misappropriation of trade secrets.  They are therefore not displaced by OUTSA.  *See Amer. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 827 (Okla. 2016) (explaining that "Section 92(B)(2) leaves in place torts not based on misappropriation of a trade secret").

### 3.    Tortious Interference with Business Relations, Breach of Fiduciary Duty, Fraud, Unjust Enrichment

Many of Tri-State's state-law claims – namely, tortious interference with business relations, breach of fiduciary duty, fraud, and unjust enrichment – rely at least in part on the same facts as the claims for misappropriation of Tri-State's trade secrets.  However, the success of these claims does not depend exclusively on a finding of trade secret misappropriation.  Even if Defendants did not misappropriate information that amounts to "protectable trade secrets" from Tri-State, the alleged conduct could still support these tort theories of relief.  For example, diverting customers to Old Rule using confidential pricing information could give rise to tortious

interference with business relations, breach of fiduciary duty, and fraud, regardless of whether the information is deemed a trade secret.  Under the reasoning of *Powell Products*, Defendants are not entitled to summary judgment on these claims on the theory of OUTSA displacement.  *See Powell Prods.*, 948 F. Supp. at 1474 (explaining that claim was not displaced, because the defendant "could be liable for interference with business relations even if they did not misappropriate any trade secrets from plaintiff").

### 4.     Injunctive Relief

Finally, the injunctive relief claim is not displaced, because both the DTSA and OUTSA provide for injunctive relief as civil remedies.  18 US.C. § 1836(b)(3)(A); Okla. Stat. tit. 78 § 87.

Defendants' motions for summary judgment based on OUTSA displacement are denied.

## VII.    Tortious Interference With Business Relations/Prospective Economic Advantage (Count 3)

Tortious interference with business relations/prospective economic advantage requires proof of: (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectance on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted.  *See Loven v. Church Mut. Ins. Co.*, 452 P.3d 418, 424 (Okla. 2019); *Gonzalez v. Sessom*, 137 P.3d 1245, 1249 (Okla. Civ. App. 2006).  The third element requiring "intentional interference" is synonymous with "malicious interference," and requires a showing of an "unreasonable and wrongful act done intentionally, without just cause or excuse."  *Loven*, 452 P.2d at 425-26 (clarifying that all variations of the tort, including interference with prospective economic advantage, require a showing of malice and bad faith).  *See also* Okla. Jury Instr. No. 24.2 (Civil) (setting forth elements of claim for tortious interference with prospective economic advantage).

Jim argues that Tri-State failed to create any genuine issue of fact as to whether Jim interfered with any business relations/prospective economic advantages of Tri-State, or whether Jim acted with malice.  ECF No. 77 at 15-16.[13]

Tri-State presents two types of misconduct by Defendants in support of its claim for tortious interference with business relations/prospective economic advantage: (1) referring Tri-State customers to Old Rule and ultimately winning bids for those customers ("referral scheme"); and (2) secretly performing labor on a Tri-State contract as part of a "pass through" scheme and ultimately obtaining other work from that customer ("pass through scheme").

### A.    Referral Scheme

As evidence supporting the referral scheme, Tri-State submits email correspondence showing that Bluejacket Public Schools and Stratford Public Schools had contacted Jim about hiring Tri-State to re-finish their gym floors in 2019.  *See* Alex Aff. at ¶ 24, Exh. A-3, Exh. A-5. Jim forwarded the request to Chad, and then Old Rule submitted estimates to Bluejacket and Stratford for the re-finishing work but Old Rule did not.  *Id.* at ¶ 24, Exh. A-3, Exh. A-4, Exh. A-5, Exh. A-6.  Old Rule obtained the Stratford re-finishing job, and Tri-State did not.  *Id.* at ¶ 24, Exh. A-7.  Tri-State also provides evidence showing that Jim set up a meeting with the Vinita Public Schools' superintendent to estimate repairing some gym floor damage.  *Id.* at ¶ 29, Exh. A-1 at TRI-STATE 000044 & TRI-STATE 000049.  Jim and Chad both attended the meeting in July 2019, and after the meeting, Old Rule submitted an estimate but Tri-State did not.  *Id.* at ¶ 29, Exh. A-10.

---

[13] Chad and Old Rule do not move for summary judgment on the merits of any of the state-law tort claims other than the OUTSA claim.

The Court concludes that Tri-State presents sufficient evidence to reach a jury on whether Jim tortiously interfered with Tri-State's prospective economic advantages based on Jim's participation in the referral scheme. The email evidence shows Jim forwarded customer requests to Chad, who then submitted an estimate on behalf of Old Rule, while Tri-State did not submit a bid. The text evidence indicates Jim and Chad both attended a meeting to discuss a bid request from Vinita Schools, and then Old Rule submitted a bid but Tri-State did not. In the case of Stratford Public Schools, Old Rule got the job from a potential Tri-State customer and arguably caused direct financial damage to Tri-State. Further, it can be reasonably inferred that Jim was aware of Chad's conduct in converting a Tri-State customer to Old Rule, because Tri-State did not follow up on the Bluejacket, Stratford, or Vinita bid requests. At least in the case of Stratford, the school's request indicates it had been a long-time Tri-State customer. *See* Alex Aff. at ¶ 24, Exh. A-5 (email request from Stratford to Jim, stating, "I was just wanting to check and see if you still wanted to take care of our gym floor like we have the last few years with you guys"). The inference of a bad-faith motive to divert business away from Tri-State is also supported by Jim and Chad's father/son relationship.

### B.   Pass Through Scheme

As evidence supporting the pass through scheme, Tri-State presents the following facts.[14] At various meetings occurring between 2016 and 2019, Jim and Chad assured their employer that Old Rule was not doing flooring work or competing with Tri-State in any way. Alex Aff. at ¶¶ 20-22. When confronted about an Old Rule labor invoice being billed to Tri-State in or around

---

[14] As explained below, Tri-State also relies on the pass through scheme as evidence in support of its claim for tortious interference with contract.

September 2017, Jim and Chad were told that Tri-State would not pay any future invoices of Old Rule and that Old Rule was not to perform labor on any Tri-State jobs.  *Id.* at ¶ 21.

Subsequently, in 2019, Tri-State entered into a contract with BAPSD to complete a floor at Oneta Middle School ("Oneta Contract").  *Id.* at ¶ 37.  Jim and Chad, acting on behalf of Tri-State, subcontracted labor on that project to Legends, which is owned by Merritt.  *Id.*; Merritt Dep. at 93:11-94:23.  Legends then subcontracted the project to Old Rule.  Alex Aff. at ¶ 37; Merritt Dep. at 93:11-94:23.  Rather than declining the labor job on a Tri-State project, Old Rule accepted the job and performed the labor on the Oneta Contract without informing Tri-State.  Alex Aff. at ¶ 37.  Old Rule avoided detection of any violation of Jim and Chad's prior assurances to the Versemans, because Legends paid Old Rule for its labor.  Old Rule obtained additional flooring work with BAPSD, after it secretly performed the labor on the Oneta Contract.  *See* Alex Aff. at ¶ 37, Exh. A-12 at Invoice #1046, #1047, #1048, #1049 (2020 Old Rule invoices for BAPSD flooring projects after completion of Oneta Contract).

The Court concludes that Tri-State presents sufficient evidence to reach a jury on whether Jim tortiously interfered with Tri-State's prospective economic advantages by Jim's participation in the pass through scheme.  Tri-State's evidence indicates Jim and Chad knew of Tri-State's prohibition on Old Rule's performing flooring jobs for Tri-State or receiving compensation for labor from Tri-State.  Yet Chad accepted the flooring job from Legends, knowing Jim and Chad had previously assured Tri-State's owners that Old Rule would not do any flooring work, and particularly flooring work for Tri-State.  A jury could infer that Jim and Chad then used that experience of completing the labor on the Oneta Contract, secretly and in bad faith, to interfere with the business relationship between BAPSD and Tri-State, and the prospective economic advantages flowing from that relationship.

As to evidence of Jim's involvement, texts between Jim and Chad indicate Jim was aware of Old Rule's involvement with the Oneta Contract and that Jim completed the labor on behalf of Old Rule.  *See* Alex Aff. at ¶ 28, Exh. A-1 at TRI-STATE 000046 & 000048 (text messages between Jim and Chad in June 2019, in which Jim informed Chad he was "done mopping" and had "coated" the floor, and Chad later informed Jim he had "[c]hecked Oneta Ridge gym floor," and it "[l]ooks really good" with "[a]bout four or five areas where there are runs," to which Jim responded "crap" and "fix them tomorrow?").  Jim claims that his text message about "mopping" was "falsely construed."  ECF No. 91 at 3.  But Jim does not elaborate on how it was misconstrued or point to any evidence to suggest an alternative interpretation of the message.  Jim also argues that any work he did on the Oneta Contract was done as President of Tri-State, and the Oneta Contract was a Tri-State project that was subcontracted to Legends.  *Id.*  Jim refers to unspecified "deposition testimony" but does not support this argument with specific evidence.  *Id.*  In the absence of supporting evidence, the Court cannot consider Jim's arguments as facts for summary judgment purposes.  *See* Fed. R. Civ. P. 56(c), (e).

Jim further contends that Tri-State cannot show he acted in bad faith in relation to this scheme, because he and Chad were permitted to subcontract labor for Tri-State jobs to independent contractors, including Merritt/Legends, and Merritt/Legends were not contractually prohibited from subcontracting the work to Old Rule.  *See* ECF No. 77 at 3 (Jim Bunnell Undisputed Material Fact Nos. 16-18).  This argument ignores Jim and Chad's alleged bad-faith conduct in violating their assurances that Old Rule would not engage in flooring work, for Tri-State or anyone else, after they were originally confronted by the Versemans in 2016 and 2017.  After these confrontations, the Versemans made clear that no future Old Rule invoices would be paid by Tri-

State.  Old Rule then used Merritt/Legends as a "pass through" or conduit, which suggests Defendants were intentionally hiding Old Rule's work from Tri-State's owners.

Finally, Jim argues that he had no control over Merritt/Legend's behavior in subcontracting to Old Rule, and Legends only subcontracted to Old Rule because of a schedule conflict.  *See* Merritt Dep. at 94:5-10.  Again, this ignores the thrust of Tri-State's theory of bad-faith conduct. Chad and Old Rule did have control over whether they would accept the job from Legends despite their prior assurances, and Jim had control over whether he assisted Old Rule in completing the labor.  A jury could find bad-faith interference with Tri-State's prospective economic advantages with BAPSD, based on Defendants' performing the flooring work on the Oneta Contract.

Jim did not make any clear arguments on the element of damages.  Notably, Tri-State presents sufficient evidence, at least to create a question of fact, that it suffered damages to its prospective economic advantages in the form of future BAPSD flooring jobs.  Specifically, a jury could infer that Old Rule used its experience with the Oneta flooring job, which it arguably completed in secret and with bad-faith motives, to obtain additional work from BAPSD, which had previously been a longtime Tri-State customer.  Alex Aff. at ¶ 37, Exh. A-12 at Invoice #1046, #1047, #1048, #1049 (2020 Old Rule invoices for Broken Arrow Public Schools flooring projects).[15]

Jim's motion for summary judgment on this claim is denied.

## VIII.   Tortious Interference with Contract (Count 4)

Tortious interference with contract requires proof of: (1) interference with a contractual right; (2) malice or wrongful interference that is neither justified, privileged, nor excusable; and (3) damages proximately sustained as a result.  *Loven*, 452 P.3d at 424.  *See also* Okla. Jury Instr.

---

[15] Jim also argues that Tri-State failed to demonstrate any benefit Jim received by working for Old Rule, but this is not a required element of a tortious interference claim.

No. 24.1 (Civil) (setting forth elements of claim for tortious interference with contract). Interference with an existing contract generally occurs in two ways: (1) the defendant directs conduct at a third party "which induces the third party to breach its contract with the plaintiff"; or (2) the defendant directs conduct at the plaintiff "which hinders plaintiff's own performance or renders plaintiff's performance more burdensome or costly." *Wilspec Techs., Inc. v. DunAn Holding Grp., Co.*, 204 P.3d 69, 71 (Okla. 2009) (explaining variations of tortious interference with contract in relation to the corresponding sections of the Restatement (Second) of Torts – namely, §§ 766 and 766A).[16]

Jim argues that Tri-State failed to create any genuine issue of fact as to whether Jim interfered with any contractual rights or acted with malice.  ECF No. 77 at 16.

To prove this claim, Tri-State relies exclusively on the pass through scheme.  ECF No. 85 at 28-29; ECF No. 87 at 27-28; ECF No. 89 at 16-17.  Tri-State identifies only the Oneta Contract, between Tri-State and BAPSD, as potentially "interfered with" by the pass through scheme.  ECF No. 85 at 28-29; ECF No. 87 at 27-28; ECF No. 89 at 16-17; Alex Aff. at ¶ 37.  Tri-State did not present the Oneta Contract as record evidence.  Tri-State's other evidence indicates this contract was for a single flooring job, rather than a contract to complete all flooring work for BAPSD for a specific time period.  Alex Aff. at ¶ 37.  Tri-State's practice at that time was to use independent contractors for flooring jobs.  Alex Dep. at 12:24-13:4. After Tri-State hired Legends as the subcontractor, Legends was paid in full by Tri-State for his invoice of $12,500, which Legends then paid to Old Rule.  Merritt Dep. at 93:1-23.  Importantly, it is not disputed that Tri-State's

---

[16] *Wilspec* also recognized that interference can occur with prospective contractual relations not yet reduced to writing.  *Id.* (explaining this third variation in relation to the corresponding section of the Restatement (Second) of Torts – namely, § 766B).  *See also* Okla. Jury Instr. No. 24.2 (Civil).

contract with Legends permitted Legends to subcontract the job to any subcontractor it chose.  *See* Alex Dep. at 50:19-22; ECF No. 77 at 3 (James Bunnell Undisputed Fact 18).  Thus, there is no evidence that Tri-State had a contractual right to control Legends' choice of subcontractor.  Merritt testified that Legends intended to do the work when it entered the contract with Tri-State, but he then contracted with Old Rule when he had a scheduling conflict and lacked the manpower to complete the job.  Merritt Dep. at 94:5-10.  Tri-State's theory of contractual interference is that Old Rule secretly performed the labor for Legends without informing Tri-State, which allowed Old Rule to avoid detection by Tri-State and ultimately convert BAPSD to an Old Rule customer.

The Court concludes that Jim is entitled to judgment as a matter of law on the claim for tortious interference with contract, based on Tri-State's failure of proof as to the "interference" element.  Defendants' conduct in relation to the pass through scheme, even if true and committed in bad faith, did not interfere with any of Tri-State's contractual rights.  Defendants did not interfere with any contractual right of Tri-State to determine what entity completed the flooring job, because Tri-State did not have that right.  Defendants did not interfere with the Oneta Contract by inducing or causing BAPSD to breach its contract with Tri-State, such as by intentionally botching the flooring work or otherwise causing a dispute between BAPSD and Tri-State that resulted in non-payment.  Defendants also did not make it more burdensome or costly for Tri-State to complete its own performance under the contract.  Legends, by and through Old Rule, completed the performance, and all parties apparently received their respective payments under the Oneta Contract and relevant subcontracts.  Although Tri-State indirectly paid an entity it did not wish to pay, this did not interfere with the Oneta Contract.  The pass through scheme supports other tort

claims, and specifically supports a claim for tortious interference with prospective economic advantage, but it does not support a claim for tortious interference with contract.[17]

Chad and Old Rule only moved for summary judgment on this claim on grounds of OUTSA displacement.  However, for the same reasons explained above in relation to Jim, Chad and Old Rule are also entitled to judgment as a matter of law on this claim.  As with Jim, Tri-State's evidence does not support a finding that Chad or Old Rule interfered with any of Tri-State's contractual rights.

A "court may grant summary judgment sua sponte so long as the losing party was on notice that it had to come forward with all of its evidence." *Scull v. New Mexico*, 236 F.3d 588, 600 (10th Cir. 2000).  Jim argued that Tri-State's evidence was not sufficient to survive a motion for summary judgment on the interference element.  The alleged tortious conduct of Jim, Chad, and Old Rule was intertwined, and Tri-State had adequate notice and incentive to produce all relevant evidence regarding how this scheme supported a tortious interference with contract claim.  Tri-State did in fact present facts to support the claim.  ECF No. 85 at 27-28.   It also included these facts in its responses to Chad and Old Rule's motions for summary judgment.  ECF No. 87 at 27-28; ECF No. 89 at 16-17; Alex Aff. at ¶ 37; Merritt Dep. at 93:11-94:20.  In this procedural posture, Tri-State had adequate notice of the need to come forward with evidence, and Tri-State will not suffer prejudice based on the Court's sua sponte grant of summary judgment to Chad and Old Rule. *Cf. Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1151-52 (10th Cir. 2017) (reversing sua sponte grant of summary judgment, where court based oral summary judgment ruling on argument

---

[17] The Court permitted this claim to proceed past the pleading stage based on the theory that Defendants interfered with Tri-State's contractual right to have the Oneta Contract performed by Legends or another subcontractor of its choosing.  ECF No. 102 at 19-20.  The summary judgment evidence ultimately does not support this theory.

not raised in briefing, and where losing party lacked any opportunity to consider court's theory and develop legal and factual arguments to dispute it).

Jim's motion for summary judgment on this claim is granted, and the Court sua sponte grants summary judgment on this claim in favor of Chad and Old Rule.

## IX.     Breach of Fiduciary Duty (Counts 5 and 6)

A claimant raising a breach of fiduciary duty claim must prove four elements: (1) a fiduciary relationship; (2) a duty arising out of the fiduciary relationship; (3) a breach of that duty; and (4) damages proximately caused by that breach. *FDIC v. Grant*, 8 F. Supp. 2d 1275, 1299 (N.D. Okla. 1998). "'An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.'" *Blue Star*, 2017 WL 6210901, at *8 (quoting Third Restatement of Agency § 801).

Jim argues Tri-State fails to provide any evidence showing that Jim participated in any business with Old Rule or assisted Old Rule in competing with Tri-State.

The Court finds Tri-State has submitted evidence raising a genuine issue of material fact regarding the elements of this claim. Jim was President of Tri-State, and Chad was its Operations Manager, until their termination in August 2019. Alex Aff. at ¶¶ 3-4. As President, Jim was responsible for managing Tri-State's office, as well as general oversight of sales and operations, including preparing bids, estimates, or quotes for work. *Id.* at ¶ 3. As Operations Manager, Chad had responsibility for sales and overseeing projects, including safety, performance, and quality of work. *Id.* at ¶ 4. In their respective roles at Tri-State, Jim and Chad had access to Tri-State's trade secrets and confidential information. *Id.* at ¶ 10. It is undisputed that Jim and Chad both owed Tri-State fiduciary duties, including a duty of loyalty.

Tri-State provides evidence showing that Jim and Chad misled Tri-State's owners about the nature of Old Rule's business and Jim's own involvement with Old Rule, and that Jim and Chad repeatedly falsely assured Tri-State's owners that Old Rule was not competing with Tri-State. *Id.* at ¶ 20-22. Alex represents that he informed Jim and Chad that Old Rule's performance of flooring work was a conflict of interest, and that any work for Old Rule during regular Tri-State work hours was unacceptable. *Id.* at ¶ 21. Tri-State provides numerous invoices dated between 2016 and 2019, showing that Chad was, in fact, performing or overseeing flooring work on behalf of Old Rule while he was working at Tri-State. *See* Alex Aff. at ¶ 32, Exh. A-12 (Old Rule invoices). Some of this work included jobs for customers who had sought bids from Tri-State, such as Stratford Schools, and Jim had been involved in receiving the customer requests and forwarding them to Chad. See *id.* at ¶ 24, Exh. A-5, Exh. A-6, Exh. A-7.

Tri-State further provides text messages and delivery tickets showing Jim and Chad used Tri-State's accounts and favorable pricing to order extra materials for Old Rule in 2019, with Jim receiving the materials at Tri-State and Old Rule paying for the materials. *Id.* at ¶ 23, Exh. A-1 at TRI-STATE 000044, Exh. A-2. When Jim and Chad were asked about the unusually large order, Jim and Chad denied that the order had been placed and blamed it on a supplier error. *Id.* at ¶ 23.

Tri-State additionally provides evidence that Jim performed work on Old Rule projects when he should have been working at Tri-State, and he was financially compensated by Old Rule for his work for that company. Alex Aff. at ¶¶ 24, 26-28, Exh. A-1 at TRI-STATE 000009 (December 2017 text messages between Jim and Chad, in which Jim asked Chad "what do you think we have coming in on recoat in December for me and you My share," and Chad responded, "Roughly 2,000"), TRI-STATE 000046 & 000048 (text messages between Jim and Chad in June 2019, in which Jim informed Chad he was "done mopping" and had "coated" the floor, and Chad

later informed Jim he had "[c]hecked Oneta Ridge gym floor," and it "[l]ooks really good" with "[a]bout four or five areas where there are runs," to which Jim responded "crap" and "fix them tomorrow?"), Exh. A-8 ($2,000 check to Jim Bunnell from Old Rule, dated June 16, 2017). Tri-State also offers an Old Rule invoice dated September 14, 2018, which listed "Jim Bunnell" as the salesperson for a flooring job for Osage Public Schools. Alex Aff. at ¶ 27, Ex. A-9 (invoice).

Jim argues that the $2,000 check dated June 16, 2017, was for Jim's sale of his trailer to Chad. However, Jim does not support this argument with any evidence. Therefore, it will not be considered for purposes of summary judgment. *See* Fed. R. Civ. P. 56(c), (e); LCvR 56.1(e). Even if it were considered, it would only create a dispute as to the material facts.

Tri-State also provides evidence suggesting that Jim sold leftover Tri-State materials without giving the sale proceeds to Tri-State. For example, on April 12, 2019, Jim and Chad texted each other about leftover materials from the Salina project, and Jim stated, "I need to sell that to Richard Pate . . . ." *Id.* at ¶ 35, Exh. A-1 at TRI-STATE 000042. Later, Richard Pate asked Tri-State to install the flooring material it had sold him, and Tri-State learned that the leftover material from the Salina project was not in Tri-State's inventory and there was no record in Tri-State's files of the sale to Mr. Pate. *Id.* at ¶ 35. Alex further represents that Jim sold Tri-State materials to others, such as Greg Fuller of Forest Wood Floors, and Jim always requested to be paid in cash. *Id.* Tri-State claims to be missing over $35,000 in flooring materials from its inventory that Jim and Chad sold. *Id.* Alex also represents that Jim sold a Tri-State truck, and there is no record of the proceeds going to Tri-State. *Id.* In response, Jim offers only his denial that he has ever stolen or sold Tri-State products to a third party for personal gain. Jim Aff. at ¶¶ 6-7. Further, the evidence discussed in Part VII regarding the referral scheme and the pass through scheme also supports a finding of a breach of fiduciary duty.

Jim's motion for summary judgment on this claim for breach of fiduciary duty is denied.

**X.     Fraud/False Representation/Deceit (Count 7) and Fraud/Nondisclosure/Concealment (Count 8)[18]**

The tort of fraud or deceit requires proof of five elements: (1) "a false representation of fact made by the defendant"; (2) "knowledge or belief of the defendant that the representation was false (often called scienter)"; (3) "an intention to induce the defendant to act or to refrain from acting in reliance"; (4) "justifiable reliance by plaintiff upon the representation in taking action or in refraining from it"; and (5) "damage suffered by the plaintiff." *Tenneco Oil Co. v. Joiner*, 696 F.2d 768, 773 (10th Cir. 1982) (cleaned up).  Fraud may also be founded on "[t]he suppression of that which is true, by one having knowledge or belief of the fact."  Okla. Stat. tit. 15 § 58(3).

Jim contends summary judgment is appropriate on these fraud claims, because Tri-State fails to describe any false representations made by Jim regarding Old Rule, and Tri-State fails to demonstrate it conducted any investigation into Jim's activities.

The Court finds triable issues regarding Jim's knowingly false representations and concealment of his knowledge regarding Old Rule, and Tri-State's justifiable reliance on those representations and concealment to its detriment.  First, Alex stated in his affidavit that Jim and Chad repeatedly and falsely represented to him and Kent Verseman at various meetings between 2016 and 2019 that Old Rule was not in competition with Tri-State for business or customers. Alex Aff. at ¶¶ 20-22.  Alex stated he informed Jim and Chad that Old Rule's performance of flooring work was a conflict of interest, and that work for Old Rule during regular Tri-State work hours was unacceptable.  *Id.* at ¶ 21.  Alex stated and provided supporting evidence suggesting that Old Rule was, in fact, competing with Tri-State for customers and business, and Jim was

---

[18] The Court refers to Counts 7 and 8 collectively as the "fraud claims."

assisting Chad in diverting customers to and performing work for Old Rule during that same time period. *Id.* at ¶¶ 24-31, Exh. A-11 (chart of Old Rule projects), Exh. A-12 (Old Rule invoices). Specifically, Tri-State provides numerous invoices dated between 2016 and 2019, showing that Chad was, in fact, performing or overseeing flooring work on behalf of Old Rule while he was working at Tri-State. *See* Alex Aff. at ¶ 32, Exh. A-12 (Old Rule invoices). One of those invoices also identified Jim as the salesman for an Old Rule flooring job. *Id.* ¶ 27, Exh. A-9 (Old Rule invoice to Osage Public Schools dated September 14, 2018, listing "Jim Bunnell" as salesperson for floor coating job).

Second, in May 2019, one of Tri-State's owners noticed that Tri-State had placed unusually large orders with its material supplier, Advantage Coating. Alex Aff. at ¶ 23. Using Tri-State's customer account and preferred pricing, Jim and/or Chad had placed an order for two pallets of recoating material and then had placed a second similar order for two more pallets a few days later. *Id.* When Jim and Chad were asked at an in-person meeting why Tri-State had been invoiced for such a large order, Jim and Chad denied that such an order had been placed or received and blamed it on an error by Advantage Coating. *Id.* However, on May 21, 2019, Jim texted Chad notifying him that four pallets from Advantage had arrived at Tri-State. *Id.* at ¶ 23, Exh. A-1 at TRI-STATE 000044. Later that day, Jim signed the delivery tickets for both shipments of the four pallets and used Tri-State equipment to unload the shipment at Tri-State's warehouse. Alex Aff. at ¶ 23, Exh. A-2 (delivery tickets). Alex represents that the second order was paid for by Old Rule. Alex Aff. at ¶ 23. Alex also stated that Jim and Chad placed other orders on Tri-State's account with Advantage Coating that were shipped to Tri-State but paid for by Old Rule in 2019 on May 10, July 3, and August 2. *Id.*

In his motion, Jim argues that Tri-State did not conduct an investigation into his actions, but this is not an element of a fraud claim. Jim further argues Tri-State does not demonstrate any additional benefit to Jim, based on the acts of Old Rule. However, a claim for fraud need not demonstrate personal financial benefit to the defendant, only damage suffered by the plaintiff as a result of the plaintiff's reliance on the defendant's misrepresentation. *See Tenneco Oil*, 696 F.2d at 773. Even if Jim acted solely for his son's financial benefit, this is sufficient for fraud. In any event, Tri-State does provide evidence that Jim did, in fact, profit from his involvement in Old Rule's scheme by sharing in Old Rule's profits from its recoating business. Alex Aff. at ¶ 26, Exh. A-8 (Old Rule check made out to Jim for $2,000, dated June 16, 2017), Exh. A-1 at TRI-STATE 000009 (December 2017 text messages between Jim and Chad, in which Jim asked Chad "what do you think we have coming in on recoat in December for me and you My share," and Chad responded, "Roughly 2,000"). Accordingly, Tri-State has raised an issue of material fact regarding its fraud claims.

Jim's motion for summary judgment on this claim is denied.

## XI.   Civil Conspiracy (Count 9)

"A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *AKC ex rel. Carroll v. Lawton Indep. Sch. Dist. No. 8*, 9 F. Supp. 3d 1240, 1244 (W.D. Okla. 2014) (quoting *Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 148 (Okla. 1998)) (cleaned up). A plaintiff pleading civil conspiracy "must allege specific facts showing an agreement and concerted action amongst the defendants, and the manner in which the conspiracy operated." *Id.* (quoting *Montgomery v. City of Ardmore*, 365 F.3d 926, 940 (10th Cir. 2004)) (cleaned up). This cause of action does not create liability, but rather enlarges the pool of potential defendants from whom a plaintiff may recover. *Earles v. Cleveland*,

No. CIV-17-1186-M, 2018 WL 5020025, at *3 (W.D. Okla. Oct. 16, 2018) (citing *Brock v. Thompson*, 948 P.2d 279, 294 (Okla. 1997)).

Jim contends Tri-State's attempt to connect him to a civil conspiracy is inadequate. Jim argues Tri-State cannot point to any unlawful conduct by Jim, or to any evidence that Jim conspired with any other defendant to commit an unlawful act.

For reasons explained above in relation to specific torts, Tri-State provides evidence raising a genuine issue of material fact regarding Jim and Chad's conspiracy to: misappropriate Tri-State's trade secrets; interfere with Tri-State's business relations; breach their fiduciary duties to Tri-State; and to make fraudulent misrepresentations to Tri-State's owners regarding Old Rule's competition with Tri-State and ordering supplies for Tri-State. Tri-State provides evidence in the form of Old Rule invoices, text messages between Chad and Jim, and delivery receipts supporting Tri-State's allegations that Jim and Chad conspired to compete with Tri-State for business and to have materials delivered to Tri-State using Tri-State's account and preferred pricing, but paid for by Old Rule. Alex Aff. ¶ 23, Exh. A-1 at TRI-STATE 000044, Exh. A-2 (delivery tickets), Exh. A-12 (Old Rule invoices). This is sufficient to raise a genuine issue of material fact regarding this claim against both Jim and Chad.

Jim's motion for summary judgment on this claim is denied.

## XII.   Conversion (Count 11)

Under Oklahoma law, the elements of civil conversion are: "(1) that the plaintiff owns certain property at the time of its conversion; (2) that defendant converted plaintiff's property by a wrongful act of disposition of the property; and (3) that damages are suffered by the plaintiff." *United States v. Lowrance*, No. 00-CV-236-K(M), 2003 WL 22327850, at *2 (N.D. Okla. Aug. 28, 2003) (cleaned up).

The Court finds Tri-State provides sufficient evidence, in the form of a detailed affidavit and text messages, to raise an issue of material fact as to whether Jim sold Tri-State materials to a third party without permission, and did not give the profits to Tri-State, which caused Tri-State financial damage.

Tri-State provides text messages suggesting that Jim sold leftover Tri-State materials from the Salina project to a third party, Richard Pate, in 2019.  Alex Aff. at ¶ 35, Exh. A-1 at TRI-STATE 000042.  Specifically, on April 12, 2019, Jim and Chad texted each other about leftover materials from the Salina project, and Jim stated, "I need to sell that to Richard Pate . . . ."  *Id.* at ¶ 35, Exh. A-1 at TRI-STATE 000042.  Later, Richard Pate asked Tri-State to install the flooring material it had sold him, and Tri-State learned that the leftover material from the Salina project is not in Tri-State's inventory and there is no record in Tri-State's files of the sale to Mr. Pate.  *Id.* at ¶ 35.  Alex further represents that Jim sold Tri-State materials to others, such as Greg Fuller of Forest Wood Floors, and Jim always requested to be paid in cash.  *Id.*  Tri-State claims to be missing over $35,000 in flooring materials from its inventory that Jim and Chad sold.  *Id.*  Alex also represents that Jim sold a Tri-State truck, and there is no record of the proceeds going to Tri-State.  *Id.*

Jim denies these allegations, questions the details of the allegations, and argues they are "entirely disconnected from reality."  ECF No. 77 at 20.  Although Jim disputes he has ever stolen or sold Tri-State products to a third party for personal gain, Jim Aff. at ¶¶ 6-7, Jim does not rebut Tri-State's evidence with anything beyond his bare denials.

Jim's motion for summary judgment on this claim is denied.

## XIII.   Unjust Enrichment (Count 12)

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Quarles v. Little River Energy Co.*, No. 00-CV-913-GKF-PJC, 2008 WL 185715, at *1 (N.D. Okla. Jan 18, 2008) (citing *Lapkin v. Garland Bloodworth, Inc.*, 23 P.3d 958, 961 (Okla. Civ. App. 2001)).   A claim for unjust enrichment requires: (1) an enrichment to the adverse party; (2) an impoverishment to the claimant; (3) connection between the enrichment and the impoverishment; (4) an absence of justification; and (5) an absence of remedies at law. *Id.* at *1-2.  "Where the plaintiff has an adequate remedy at law, the court will not ordinarily exercise its equitable jurisdiction to grant relief for unjust enrichment." *Id.* at *2 (citing *Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1035 (Okla. 2006)).

Jim argues this claim fails as a matter of law, because any of Tri-State's other claims would provide Tri-State an adequate remedy at law as counterclaims in another action filed by Jim against Tri-State in Rogers County.  *See* ECF No. 102 at 5 (explaining nature of Jim's lawsuit against Tri-State).  Jim further disputes that the alleged acts ever occurred, and he argues that Tri-State's allegations regarding this claim are without merit.

The Court has already found in the Opinion and Order on Jim's Motion to Dismiss that Tri-State's claims are not compulsory counterclaims in the Rogers County action.  *See* ECF No. 102 at 5-11.  The Court further finds Tri-State has adequately raised questions of material fact regarding its claims against Jim for tortious interference with business relations, breach of fiduciary duty, fraud, civil conspiracy, and conversion.  The unjust enrichment claim may remain in the case as an alternative pleading, while Tri-State attempts to prove its other claims.  *See*

*Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1030 (10th Cir. 2007) (permitting plaintiff to pursue unjust enrichment as an alternative claim under Oklahoma law, so long as plaintiff does not obtain double recovery for the same injuries).

Jim fails to offer any record evidence, beyond his own denials, to rebut Tri-State's evidence.  Jim's primary argument in the reply brief – that Jim only received money from Old Rule for selling Chad a trailer – is not supported by any evidence and will not be considered for summary judgment purposes.

Jim's motion for summary judgment on this claim is denied.

## XIV.  Injunctive Relief (Count 13)

Finally, Jim requests in a footnote that this claim be dismissed against him, because Jim has "created zero harm to Tri-State."  ECF No. 77 at 21 n.4.  As with other claims, Jim does not offer any actual evidence to rebut Tri-State's evidence or entitle him to summary judgment.  Jim further argues this claim is unnecessary and could be adequately brought in his lawsuit against Tri-State in Rogers County.  *Id.*  The Court has already found in the Opinion and Order on Jim's Motion to Dismiss that Tri-State's claims are not compulsory counterclaims in the Rogers County action.  *See* ECF No. 102 at 5-11.

Jim's motion for summary judgment on this claim is denied.

## XV.  Conclusion

For the reasons detailed above, Defendant James R. Bunnell's Motion for Summary Judgment (ECF No. 77) is **GRANTED IN PART and DENIED IN PART**.  Defendant Old Rule Services, LLC's Motion for Summary Judgment (ECF No. 76) is **GRANTED IN PART and DENIED IN PART**.  Defendant Chad Bunnell's Motion for Summary Judgment (ECF No. 75) is **GRANTED IN PART and DENIED IN PART**.

Summary judgment is granted on the following remaining claims:

- Count 4 (tortious interference with contract) – all Defendants
- Count 10 (federal FCAA) – Chad[19]

The following claims remain in the case:

- Count 1 (federal DTSA) – all Defendants
- Count 2 (OUTSA) – all Defendants
- Count 3 (tortious interference with business relations) – all Defendants
- Count 5 (breach of fiduciary duty) – Jim
- Count 6 (breach of fiduciary duty) – Chad
- Count 7 (fraud/false representation/deceit) – Jim and Chad
- Count 8 (fraud/nondisclosure/concealment) – Jim and Chad
- Count 9 (civil conspiracy) – Jim and Chad
- Count 11 (conversion) – Jim and Chad
- Count 12 (unjust enrichment) – Jim and Chad
- Count 13 (injunctive relief) – all Defendants

**SO ORDERED** this 30th day of September, 2022.

**JODI F. JAYNE, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

---

[19] This claim was previously dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) as to Jim, and Count 10 no longer remains in the case.